IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

United States of America,

    Plaintiff,

vs.                                          Case No. 05-10068-JTM

Eugen Radu Toma,

    Defendant.

MEMORANDUM AND ORDER

Six years after working in Wichita, Kansas while attending community college on a student visa, and after making multiple trips between the United States to the Netherlands, Dutch citizen Eugen Radu Toma learned in 2011 that the federal government has charged him with making false statements in connection with his 2005 Wichita employment. The court finds that the present prosecution violates Toma's constitutional right to a speedy trial, and grants his motion to dismiss.

*Findings of Fact*

In 2005, Toma, who was born in Romania but holds Dutch citizenship, lived in Wichita while he attended Butler County Community College. For approximately one month, Toma also worked as a Security Guard/Emergency Medical Technician at the Wichita Greyhound Park. In

connection with that employment, on March 4, 2005 Toma completed a form Kansas Racing and Gaming Commission Occupation License Application. The completed form shows a checkmark in the box indicating that the person completing the form is a United States citizen. This checkmark forms the basis for the government's April 6, 2005 indictment of Toma for falsely claiming United States citizenship, in violation of 18 U.S.C. § 911.[1] Toma did not learn of the Indictment until six years later.

Shortly after his employment at the Greyhound Park, Toma transferred from Butler County Community College in Wichita to Cowley County Community College in Winfield, Kansas. In connection with the transfer, Toma gave a copy of his existing I-20 — an authorization to attend school in the United States — to Cowley and was told they would issue a new one. He also reported his change of address with the Kansas Department of Motor Vehicles, and with the school's Designated School Official (DSO), thereby complying with 8 C.F.R. § 214.2(f)(17).

Carl Timmons, a Deportation Officer with ICE, testified that agents twice tried to locate Toma by checking residences. In addition, ICE Agent Jeffrey Artman created an entry into the Treasury Enforcement Database of Investigations (TECS), documenting the Indictment and federal arrest warrant for Toma. However, ICE agents did not enter Toma's name into NCIC, because they mistakenly believed that the U.S. Marshals Service entered defendants into NCIC whenever federal arrest warrants are issued. ICE agents themselves rarely make NCIC entries, because the agents normally already have custody of persons for whom criminal charges are brought. Timmons testified

---

[1] On the same day, Toma also signed a federal Employment Eligibility Verification, which also indicates American citizenship. These two representations underlay the original two charges in the Indictment. On January 12, 2012, Judge Wesley E. Brown granted the government's unopposed motion to dismiss Count 2. The remainder of the case involves the license application submitted to the Kansas Gaming Commission.

2

that protocol would require investigating agents to consult additional resources or databases, but could not testify that the agents actually followed any of these procedures in Toma's case.

On June 14, 2006, Toma was briefly detained near Buffalo, New York. Toma attempted to visit the Canadian side of Niagra Falls by crossing the Rainbow Bridge, but was refused entrance because he did not have a copy of his current I-20. Returning to the American side, his was detained by ICE officers for the same reason. There was no entry in NCIC to show the Wichita arrest warrant. The ICE officers did have access to the TECS system, but there is no evidence that they ever contacted agents in Wichita to learn the status of the Greyhound Park charges. Toma was held for approximately six hours and released.

Toma was interviewed by an immigration judge in July, 2006, and his sworn statement was introduced into evidence. At no time during the interview was Toma asked about the Wichita charges, and his statement does not mention the issue. ICE agents issued Toma a "notice to appear" for an immigration hearing on November 24, 2006, and released him into the United States.

On July 26, 2006, Toma left the United States for the Netherlands, where he continued his education in nursing.

According to the government, after learning of the Buffalo detention, Artman entered the information relating to the Wichita charges in NCIC on July 5, 2006. However, since NCIC information must be updated yearly, the active NCIC warrant notice was not renewed and expired in July 2007. The ICE TECS entry was updated on October 29, 2007 to reflect that the warrant remained outstanding.

In 2009, Toma sought and obtained a three-month tourist visa, and returned to America on April 16, 2009, for approximately two weeks. Toma was not questioned in the Netherlands about

the Wichita charges during the visa application process, and was allowed to enter through customs despite the TECS entry. According to the government, Customs officers later noticed the TECS entry and entered a lookout order for Toma. However, since ICE had allowed the NCIC active warrant entry to lapse, the lookout order was limited to 24 hours.

Toma made repeated trips to the United States during the next few months, returning for approximately two weeks in June, October, and December. In April, 2010, Toma returned to the United States and has lived here since that time. His tourist visa expired in June of 2009, and he obtained a new tourist visa prior to his return in October, 2009. At no time during these visa applications or during his travels did any ICE or Homeland Security Agent mention the Greyhound Park charges.[2]

In late 2009 or early 2010, Toma submitted an application for a nursing license to the State of Missouri. In connection with the application, Missouri issued a Notice of Criminal History Report, which showed an unrelated incident in 2003, and the Rainbow Bridge detention in 2006. It made no mention of the Wichita Indictment in 2005.

In 2010, Toma married an American citizen, Andrea Williams-Toma of Destin, Florida, whom he had originally met during one of his visits in 2009. After his marriage, he submitted an ICE Form I-485 application to adjust his status from B-2 Tourist to permanent resident. Toma first learned of the Wichita charges in March of 2011, after he hired an attorney to inquire into the

---

[2] The government notes that Toma was asked in some instances whether he had been arrested, appeared before a magistrate or judge, or had made a prior claim of American citizenship. There was no mention specific mention of the Wichita charges, however, and such questions would not have alerted Toma to their existence. Toma testified that he was asked similar questions in connection with his original student visa in 2003.

status of his request to change status. The attorney performed a search, and discovered the Greyhound Park charges.

Toma made no effort to hide his location. He states that he and his wife have suffered stress once they learned of the criminal charges, and he has had to defer employment opportunities.

Toma's application is currently suspended because immigration officials, when investigating the application, learned of the outstanding federal arrest warrant and, on May 6, 2011, notified Toma he needed to provide additional information about the warrant and Indictment. On January 18, 2012, Toma, who had become "out of status" in the United States, turned himself in to ICE and Marshals Service officials in Wichita.

*First Amendment*

Defendant Toma has presented two motions seeking dismissal of the prosecution. In the first, he argues that the prosecution violates his free speech rights under the First Amendment. Specifically, he contends that the present prosecution violates his First Amendment rights, since the relevant statute, 18 U.S.C. § 911, punishes false statements of citizenship, without any explicit requirement of showing a governmental interest in the challenged statement.

Toma cites no case which has found § 911 unconstitutional. Courts which have addressed First Amendment challenges to either § 911 (or its predecessor, 8 U.S.C. § 746(a)(18)) have uniformly rejected them, adopting narrowing interpretations — such as requiring proof that the statement of citizenship was made in response to a person with legitimate reasons for inquiry — to satisfy constitutional scrutiny. *See United States v. Esparza-Ponce*, 193 F.3d 1133 (9th Cir. 1999);

*United States v. Achtner*, 144 F.2d 49, 52 (2nd Cir. 1944); *United States v. Franklin*, 188 F.2d 182 (7th Cir. 1951); *United States v. Tandaric*, 152 F.2d 3 (7th Cir. 1945).

While the Tenth Circuit has not explicitly upheld the constitutionality of § 911, it has adopted just such a narrowing interpretation of the statute in its Pattern Jury Instructions, requiring additional proof that "the defendant knew he was not a citizen and deliberately made this false statement with intent to disobey or disregard the law."

Further, while it has not explicitly endorsed the constitutionality of § 911, the Tenth Circuit has come about as close as possible. In *United States v. Strandlof*, 667 F.3d 1146 (10th Cir. Jan. 27, 2012), the court recently upheld the constitutionality of the Stolen Valor Act, 18 U.S.C. § 704(b), which prohibits false claims of decorated service in the armed forces. In the course of concluding that the Act was constitutional, the court noted the existence of other instances of statutes prohibiting knowingly false statements, including 18 U.S.C. § 1001(a), which criminalizes false statements made to the government. It also observed:

> Section 1001 is not a lone example. To the contrary, there are at least 100 other federal criminal statutes that penalize making false statements—none of which has been invalidated under the First Amendment. *See United States v. Wells*, 519 U.S. 482, 505, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (Stevens, J., dissenting) ("[A]t least 100 federal false statement statutes may be found in the United States Code. About 42 of them contain an express materiality requirement; approximately 54 do not."). **For example, it is a crime to falsely and willfully claim to be a citizen of the United States,** 18 U.S.C. § 911, and it is a crime to make a knowingly false statement for the purpose of establishing eligibility to vote, 42 U.S.C. § 1973i(c). Likewise, various perjury statutes criminalize false statements made under oath, even if the perjurer has no intent to mislead, and even if there is no harm to the tribunal or inquiry. *See* 18 U.S.C. § 1623; 18 U.S.C. § 1621; *Brogan* [v. United States], 522 U.S. [398,] 402 & n. 1, 118 S.Ct. 805 [(1998)]. **As with § 1001, the Court has never suggested these provisions are unconstitutional**.

667 F.3d at 1165-66 (emphasis added).[3] Thus, in resolving the constitutionality of the Stolen Valor Act, the Tenth Circuit referenced the statute in the present action as an example of false statement crimes which are not subject to constitutional doubt.

The court finds that 18 U.S.C. § 911 does not unconstitutionally burden the defendant's First Amendment rights, and denies his Motion to Dismiss advancing that argument.

***Speedy Trial***

The right to a speedy trial arose when Toma was indicted in 2005. *Jackson v. Ray*, 390 F.3d 1254, 1261 (10 Cir. 2004). "Depending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett v. United States*, 505 U.S. 647, 652 n. 1 (1992). If the presumptively prejudicial standard is met, the court must balance the length of delay, the reason it occurred, the degree to which the defendant sought to protect his rights, and any resulting prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). This court recently discussed the issue in *United States v. Thomas*, No. 09-10099-07-JTM (D. Kan. Oct. 27, 2011) (Dkt. 377).

Balancing the four factors here, the court finds that Toma's speedy trial motion should be granted. First, the delay here — over six years elapsing between the Indictment and Toma's entry of appearance on January 9, 2012 — is clearly substantial. Indeed, it is approximately five to six times the amount of delay which triggers the presumptively prejudicial analysis.

---

[3] The *Strandlof* court recognized that the Ninth Circuit had previously held in *United States v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010) that the Stolen Valor Act was unconstitutional, and the Supreme Court has granted *certiorari* on the issue. 132 S.Ct 457 (2011). *See Strandlof*, 667 F.3d at 1153.

7

This delay was primarily due to governmental negligence. Toma notified the State of Kansas and his school of his changes of address, and made no effort to hide his location. Governmental efforts to locate him were ineffective and negligent. A lack of familiarity with procedures led ICE officers to omit Toma's information from NCIC. Once it was entered, it was allowed to lapse. There is no evidence that agents sought to track down Toma by contacting either the State of Kansas or his community college. Toma made repeated trips back and forth between the United States and the Netherlands, and was never stopped because of the Wichita Greyhound Park charges, or even alerted to their existence. Toma did not slip through the government's grasp, there was no grasp to slip through.

Toma's assertion of his right to a speedy trial was timely. Toma was not aware of the false statement charges against him until 2011, and he raised the issue promptly following his arraignment.

The government argues that Toma cannot satisfy the fourth factor, actual prejudice. Such prejudice may arise from (a) oppressive pretrial incarceration; (b) the inherent anxiety and concern faced by an accused; and (3) hindrance of the accused's defense. *Barker v. Wingo*, 407 U.S. 514, 532 (1972); *Jackson*, 390 F.3d at 1264. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* Here, Toma was not subject to any pretrial incarceration, and he spent the majority of the time outside the United States, free from any concern of arrest and removal to this country to answer the charges against him. The government stresses that the delay will not substantially impair Toma's ability to present a defense, given the simple nature of the charge and the evidence.

Generally, the burden of showing all types of prejudice lies with the individual claiming the violation and the mere "possibility of prejudice is not sufficient to support [the] position that ... speedy trial rights [are] violated." *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). For example, prejudice occurs only when "defense witnesses are unable to recall accurately events of the distant past. *Barker v. Wingo*, 407 U.S. at 532. In determining whether a delay has actually prejudiced a defendant, the court may consider the complexity of the case as reflected in the number of witnesses and amount of physical evidence. *See Backus v. Hartley*, 346 F3d. App. 336, 339 (10th Cir. 2009).

The court agrees that charges are not complex, and the number of witnesses will be limited. It does not follow, however, that Toma has not shown his ability to defend the action will be impaired. Beyond the mere fact of a false claim of citizenship, a prosecution under 18 U.S.C. § 911 requires that the defendant's "misrepresentation was willful (i.e. voluntary and deliberate)." *United States v. Karaouni*, 379 F.3d 1139, 1142 (9th Cir. 2004). Toma credibly testified at the hearing on this matter that he could not recall certain events relating to the Gaming Commission form, such as whether the notary who signed the form was actually present. By delaying the present prosecution until after some six years after the completion of the challenged document, the government has diminished the defendant's ability to credibly testify to the circumstances of the alleged crime.

More importantly, the *Barker* factors are to be balanced together. No single factor is a "necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Barker*, 407 U.S. at 530. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id*.

Thus, in extreme cases, the defendant may establish a Sixth Amendment violation even in the absence of a showing of actual prejudice. In *Doggett v. United States*, 505 U.S. 647, 652 n. 1 (1992)*,* the Court relieved the defendant of any need to show actual prejudice, given the cause and extent of the delay. Specifically, the court stressed the findings of the lower courts that the eight and a half year delay in arresting the defendant was the product of government negligence, and that the delay was "six times as long as that generally sufficient to trigger judicial review." 505 U.S. at 658. "When the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review, and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief." *Id*. (footnotes and citations omitted).

Following *Doggett*, various courts have concluded that, where the government delays a prosecution for half a decade or longer, the burden is on the government to persuasively rebut a presumption of negligence. *See United States v. Bergfeld*, 280 F.3d 486 (5th Cir. 2002) (negligent five-year delay); *United States v. Brown*, 169 F.3d 344, 349, 351 (6th Cir.1999) (five and one half year delay); *United States v. Shell*, 974 F.2d 1035 (9th Cir. 1992) (negligent five-year delay). This burden arises because extreme delay may create prejudice of which the defendant may be unaware; accordingly "the likelihood of evidentiary prejudice, though difficult to prove, increases in tandem with the length of the delay." *Goodrum v. Quarterman*, 547 F.3d 294, 260 (5th Cir. 2008).[4]

---

[4] *See Doggett*, 505 U.S. at 655 ("excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify"); *id*. at 657 ("[T]he weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness"). In contrast, a delay which is barely sufficient to trigger the presumptively prejudicial analysis will not be given decisive influence in determining the existence of actual prejudice. *See United States v. Martinez*, 198 Fed.App. 704, 709-10 (10th Cir. 2006) (finding that

Case law in the Tenth Circuit is consistent with this conclusion. While observing that *Doggett* "would seem to relieve a defendant of any need to show particularized prejudice when the delay is sufficiently lengthy," the Tenth Circuit has expressly left open "the question whether a delay of less than six years can ever be long enough to relieve a defendant of the need to illustrate prejudice." *United States v. Cone*, 310 Fed.Appx. 212, 218-19 (10th Cir. 2008), citing *Jackson v. Ray*, 390 F.3d 1254 (10th Cir. 2004). In *Jackson*, the court discussed the issue in the context of a habeas review, and accordingly considered the issue under the standard of whether the delay was contrary to clearly established Supreme Court prejudice. But the *Jackson* court also noted that "other circuits, when applying *Doggett* in cases involving delays of less than six years, have more clearly defined the minimum amount of delay necessary to relieve a defendant of the need to make a particularized showing of prejudice," contrasting the five year delay in *Bergfeld* with *United States v. Serna-Villarreal*, 352 F.3d 225, 231-33 (5th Cir.2003), where a three-year delay was not sufficient to require dismissal.

Most recently, in *United States v. Toombs*, 574 F.3d 1262 (10th Cir. 2009), the Tenth Circuit rejected a speedy trial claim based upon a delay of 22 months, most of which were attributable to the defendant. The court stressed that the delay fell outside of the rule in *Doggett*, citing and quoting with approval language from *Serna-Villareal* stating that "this Court and others generally have found presumed prejudice only in cases in which the post-indictment delay lasted at least five years." 574 F.3d at 1275 (quoting 352 F.3d at 232).[5]

---

delay of some 14 months was "far shorter" than the delay in *Doggett*, and should not receive "undue weight in the analysis").

[5] Both *United States v. Larson*, 627 F.3d 1198, 1209 (2010) and *United States v. Seltzer*, 595 F.3d 1170, 1180 n. 3 (2010), cite (directly or indirectly) *Jackson*, 390 F.3d at 1254, for the

The *Barker* factors "have no talismanic qualities," and "must be considered together with such other circumstances as may be relevant," which may result in "a difficult and sensitive balancing process." *Barker*, 407 U.S. at 533, 92 S.Ct. 2182. This balancing is committed to the discretion of the court. *United States v. Comosona*, 848 F.2d 1110, 1114 (10th Cir. 1998). The court finds that the 72 month delay in the present action is extreme, that the defendant acted promptly to raise the defense, that the delay was primarily the fault of governmental negligence and was not prompted by any action of the defendant, and that the government has failed to persuasively rebut the resulting presumption of prejudice to the defendant. As a result, the present prosecution cannot be maintained consistent with the defendant's Sixth Amendment right to a speedy trial, and his Motion to Dismiss is granted.

IT IS ACCORDINGLY ORDERED this 19th day of April, 2012, that the defendant's First Amendment Motion to Dismiss (Dkt. 19) is denied; his Sixth Amendment Motion to Dismiss (Dkt. 5) is granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

---

proposition that "[g]enerally, the court requires a delay of six years before allowing the delay itself to constitute prejudice," without noting either that *Jackson* was decided on habeas review (with the court determining simply that "because the delay is less than six years, *clearly established Supreme Court law* does not require application of the *Doggett* rule, 390 F.3d at 1254), or its favorable citation to *Bergfeld* (which applied the presumption of prejudice in the case of a five year delay).